## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JOSEPH DAVIS, ) | |
| ) | |
| Petitioner, ) | |
| ) | **CIVIL ACTION** |
| v. ) | |
| ) | **No. 06-3127-KHV** |
| SAM CLINE, et al., ) | |
| ) | |
| Respondents. ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

Pursuant to 28 U.S.C. § 2254, Joseph Davis seeks a writ of habeas corpus based on failure

to disclose exculpatory evidence, ineffective trial counsel and cumulative error.  See Petition

Pursuant To 28 U.S.C. § 2254 (Doc. #1) filed April 28, 2006.  For reasons stated below, the Court

overrules Davis' petition.

## Procedural Background

On April 28, 1998, the district attorney for Douglas County, Kansas charged Davis with two

counts of aggravated burglary.  See Probable Cause Complaint in No. 98CR529.[1]  Specifically, the

prosecution charged that (1) on April 9, 1998, Davis burglarized the residence of Dmitri Novikov

and Olga Lozina (Count 1); and (2) on April 12, 1998, Davis burglarized the residence of Kristina

Vogel (Count 2).  The state district court appointed John Frydman to represent Davis at trial.  On

August 19, 1998, a jury found Davis guilty on Count 2, but could not reach a verdict on Count 1.

On October 1, 1998, the state district court sentenced Davis to 114 months in prison on Count 2,

beginning April 27, 1998.

---

[1]     The complaint included two additional counts of aggravated burglary and one count
of criminal trespass, see id., but the prosecution apparently dropped those charges before trial.

Davis appealed his conviction to the Kansas Court of Appeals.  The state district court appointed Jessica R. Kunen, chief appellate defender, to represent Davis on appeal.  See Order Appointing Counsel filed September 20, 1998 in No. 98CR529.  On appeal, Davis argued that (1) the trial court abused its discretion in refusing to allow testimony regarding Jerry Hunter's arrest for aggravated burglary on June 1, 1998; (2) the trial court improperly instructed the jury; and (3) the trial court did not properly inquire into Davis' concerns regarding ineffective assistance of trial counsel.  On March 24, 2000, the Kansas Court of Appeals affirmed the conviction.  On June 14, 2000, the Kansas Supreme Court denied Davis' petition for review.

On September 14, 2000, Davis filed a *pro se* motion for review under K.S.A. § 60-1507 in the District Court of Douglas County, Kansas.  Davis asserted that (1) trial counsel was ineffective in failing to call witnesses who could have provided exculpatory evidence; (2) Davis did not receive due process because he did not have an opportunity to present exculpatory evidence; (3) trial counsel and appellate counsel were ineffective in not objecting to police line-up procedures; and (4) Davis did not receive due process because police used an inherently and impermissibly suggestive identification procedure.  See Motion in No. 00-C-394.  The state district court appointed Edward G. Collister to represent Davis in the post-conviction proceedings.  On January 18 and 19, 2002, the state district court held an evidentiary hearing on Davis' petition for relief under K.S.A. § 60-1507.  On September 24, 2003, the state district court entered an order which denied Davis' petition for habeas relief.  See Memorandum Of Decision in No. 00-C-394.

Davis appealed the denial of post-conviction relief to the Kansas Court of Appeals.[2]  On appeal, Davis argued that (1) trial counsel was ineffective in attacking eyewitness identification;

_____

[2]        Collister continued to represent Davis on appeal.

(2) the state did not produce exculpatory evidence; and (3) the trial court erroneously instructed the jury regarding eyewitness identification.  On November 24, 2004, the Kansas Court of Appeals affirmed the denial of post-conviction relief.  On May 3, 2005, the Kansas Supreme Court denied Davis' petition for review.

### Evidence At Trial

On August 17 and 18, 1998, the state district court held trial in the underlying criminal case. Before trial, Davis refused to get dressed and go to court.  Davis told the judge that trial counsel had not obtained what he requested, including fingerprints, an official line-up and a polygraph test. See Trial Transcript, Record-Vol. No. V at 3:1-4:1.  Defense counsel Frydman told the judge that Davis had asked him to file a motion for recusal and for counsel to withdraw from the case.  Id. at 4:13-17.  Counsel stated that he did not file the motion, that he had explained to Davis that nothing improper had occurred, and that he would challenge the veracity of the witnesses at trial.  Id. at 4:17-23.  The trial judge denied Davis' request for a new attorney, stating that he had a "great deal of confidence" in defense counsel and that counsel was "one of the best defense attorneys in town." Id. at 5:19-23; 8:20-22.  Later, after a full day of trial, the judge asked Davis if he was still unhappy with his attorney.  See Trial Transcript, Record-Vol. No. VI at 69:3-5.  Davis replied, "I'm satisfied."  Id. at 69:6.

In opening argument, defense counsel Frydman focused on eyewitness identification.  He told the jury that the evidence would show that the photo eyewitness identifications were flawed. See Trial Transcript, Record-Vol. No. V at 17:6-12.  He explained that when Novikov and Lozina could not identify Davis in a line-up of six photos, police switched five of the photos and put in a different photo of Davis.  Id. at 18:6-9; 19:3-8.  Frydman stated that at the preliminary hearing on

April 24, 1998, Novikov testified that he was unsure whether Davis was the man who entered his house. Id. at 19:24-20:4. Counsel stated that immediately after the burglary, Novikov described the intruder as a 145-pound man in his early twenties. Davis was in his early thirties and weighed more than 180 pounds. Id. at 11-17. Counsel pointed out that none of the witnesses mentioned the mole on the right side of Davis' face. Id. at 20:17-21. Counsel told the jury that Vogel saw the intruder for only one or two seconds and that she could not identify Davis in the first photo line-up. Id. at 20:22-21:3. He advised them, when Vogel testified, to think about the time frame and how memories work. Id. at 21:4-5.

The State called Novikov, who testified in English (with an interpreter standing by) to the following facts.[3] Novikov is 30 years old and has a working knowledge of the English language. Trial Transcript, Record-Vol. No. V at 24:12-15, 25:6-7. On April 9, 1998, Novikov lived with his wife, Olga Lozina, at 1317 Kentucky Street, Apartment 6, in Lawrence, Kansas. Id. at 25:8-10, 26:1-5. In the early morning hours on April 9, Lozina woke him up. He saw a black man standing near his bed holding some of his wife's clothes. Id. at 26:6-15. Novikov recognized the intruder as a man who had knocked on his door a couple of weeks earlier and asked him to buy a gold ring. Id. at 26:22-25. Novikov told the intruder that he had seen him before. Id. at 26:16-17. About 20 seconds later, the intruder left. Id. at 27:15-18. After that, Novikov discovered that his keys were missing and called police. Id. at 27:19-25. Novikov described the intruder as a black man, about his height, with a gold ring. Id. at 28:21-25. The prosecution asked whether Novikov saw the man in the courtroom. Novikov replied that he was unsure because it had happened too long ago. Id. at

---

[3]     Novikov and his wife are apparently from Russia. See Memorandum In Support Of Petition For Writ Of Habeas Corpus (Doc. #2) filed April 28, 2006 at 2.

29:1-7.  Novikov testified that about a week after the incident, police showed him a line-up of six photos (State's Exhibit 1) and he could not identify the intruder.  Id. at 29:8-30:4.[4]  A few days later, police showed him a second set of pictures (State's Exhibit 2) and Novikov identified photograph number two (Davis) as the intruder.  Id. at 30:12-31:24.

On cross examination, Novikov said that when the man tried to sell him a gold ring, Novikov had talked to him for three to four minutes.  Id. at 32:19-23.  Novikov remained inside his apartment and the man stood outside, about three feet away.  Id. at 32:24-33:6.  It was dark, but Novikov had a porch light on and could see the man clearly.  Id. at 33:10-18.  When Novikov recognized the man in his home on April 9, he had maybe ten to 15 seconds to view him before he left.  Id. at 35:9-24.  About two hours later, Novikov and his wife spoke to police without an interpreter.[5]  Id. at 36:1-15.  During the interview, Novikov described the intruder as a black man, about his height and weight.[6]  Id. at 37:10-38:20.  Looking at the first photo line-up, Novikov said that the man in photograph number six (an old photograph of Davis) did not look exactly like Davis.  Id. at 39:11-20.  Novikov also testified that that photograph did not look like photograph number two in the second line-up (a recent photograph of Davis).  Id. at 39:21-40:3.  Novikov stated that he was unsure whether Davis was the intruder in his home on April 9.  Id. at 41:19-42:2.

Lozina testified through an interpreter to the following facts: Lozina is 26 years old.  Around

---

[4]       At trial, the prosecution showed him the same photos.  Novikov stated that he did not think that Davis' picture was included in the photos.  Id. at 30:5-7.  In fact, the line-up included an old photograph of Davis (photograph number six).

[5]       Novikov testified that his father was present and translated during the police interview.  Id. at 36:25-17:2.

[6]       Novikov testified that he used meters and kilograms to describe the intruder instead of pounds and inches.  Id. at 38:17-20.

5:00 a.m. on April 9, she awoke to a black man standing near her bed, holding her pants and jacket. Id. at 43:9-19, 44:9-12.  The man began talking in English.  Id. at 43:22-25.  Lozina did not understand what he said.  She woke her husband Novikov, who said something to the man.  Id. at 44:3-8.  Lozina recognized that the man had come to their apartment several weeks before and asked her husband for money.  Id. at 44:16-23.  In the courtroom, Lozina identified Davis as the intruder. Id. at 49:4-25.

The State called Kristina Vogel, who testified to the following facts: Vogel is 20 years old. Id. at 56:15-16.  On April 12, 1998, she lived with three roommates at 1310 Kentucky Street, Apartment 1, in Lawrence, Kansas.  Id. at 56:17-22.  Around midnight, Vogel was on the third level of the apartment, watching television.  Id. at 56:23-57:7.  Vogel heard someone enter the apartment and thought it was her roommate.[7]  Id. at 57:8-15.  Vogel yelled down, but the person did not reply. Id. at 57:14-16.  A couple of minutes later, Vogel looked over the balcony and saw the back of a man standing about ten feet below in the apartment.  Id. at 57:20-23, 62:6-7.  The man turned around, looked up at her and asked, "Is Jeff here?"  Id. at 58:4-9.  Vogel replied that Jeff was not there.  Id. at 48:10.  The man said that he was sorry and left the apartment.  Id. at 58:10-13, 73:11-15.  After that, Vogel noticed that her wallet was open and missing money, so she called the police. Id. at 59:20-24. About two weeks later, police showed Vogel a line-up of six photos (State's Exhibit No. 1).  Id. at 63:10-19.  Vogel could not identify the intruder in those photographs.[8]  Id. at 63:20-24.

---

[7]     Vogel had left the front door unlocked because she expected her roommate.  Id. at 57:8-13.

[8]     Photograph number six in that array was an old photograph of Davis.

One week later, police showed Vogel a second set of six photos (State's Exhibit No. 2).[9] Id. at 64:1-11.  Vogel did not positively identify anyone, but she said that photograph number two (a recent photo of Davis) "could possibly most likely be him."  Id. at 14-16.  In the courtroom, Vogel identified Davis as the man who was in her apartment.  Id. at 62:23-63:9.

On cross examination, defense counsel pointed out that Vogel did not positively identify Davis until the preliminary hearing, about six weeks after the incident.  Id. at 69:22-70:11.  Vogel testified that she did not recognize the man in photograph number six of the first line-up.  Id. at 71:13-16.

The State called Henry Volante, who testified to the following facts: Volante is 22 years old and studies accounting at the University of Kansas.  Id. at 76:16-23.  In April of 1998, Volante was dating Erin Hobe, one of Vogel's roommates.  Id. at 76:24-77:4.  In the afternoon of April 11, Volante stopped by Vogel's apartment.  He left his book bag on the floor by the front door and has not seen it since.  Id. at 77:10-78:3, 80:19-25.  The bag contained two calculators, a small Casio and a so-called TI81.  Id. at 78:4-10.  Volante recognized the calculators as State Exhibit Numbers 5 and 6, which he identified based on the name and initials which he had placed on them.  Id. at 78:14-24.  Volante testified that he did not know Davis, that he did not give Davis permission to use his calculators, and that he had no idea how Davis would have gotten hold of the calculators.  Id. at 79:23-80:10.

The State called Darren Othick, detective for Lawrence police, who testified to the following facts: In April of 1998, Othick investigated the robberies at the Vogel and Novikov/Lozina

---

[9]       The second line-up contained five new photos and a more recent photo of Davis in photograph number two.

apartments.  See Trial Transcript, Record-Vol. No. VI at 4:11-15.  On April 24, 1998, Othick

assembled a photographic line-up of six black men which included a picture of Davis in photograph

number six (State's Exhibit No. 1).  Id. at 4:22-5:12.  Othick showed the line-up to Novikov and

Vogel, but neither recognized Davis as the intruder.[10]  Id. at 5:13-6:4.  Othick then assembled a

second photo line-up which included photographs of five different black men and a more recent

picture of Davis in photograph number two (State's Exhibit No. 2).[11]  Id. at 6:5-10, 9:16-17, 22:14.

Othick showed the second line-up to Vogel, Novikov and Lozina.  Id. at 6:11-20, 7:5-8.  Vogel did

not identify any of the photographs in the second line-up.  Id. at 6:18-21.  Novikov and Lozina

identified photograph number two (the recent photo of Davis) as the man who entered their

apartment on April 9.[12]  Id. at 7:9-12.  On April 28, 1998, Othick executed a search warrant for

Davis' apartment, which was located about three blocks from the crime scenes.  Id. at 11:3-19.  At

the apartment, officers recovered Volante's calculators from a living room shelf.[13]  Id. at 11:20-

12:16.

On cross examination, Othick testified that when he prepared the first photo line-up, he knew

that Davis was a suspect and tried to include a photograph which correctly portrayed him.  Id. at

17:2-6. Defense counsel asked whether it would have been more effective and more fair to conduct

---

[10]        Othick testified that when he showed the first line-up to Novikov, he did not realize that Lozina had seen the intruder.  Id. at 6:13-17.  It appears, however, that Lozina was present when Novikov viewed the first line-up.

[11]        Othick testified that the two photographs of Davis were different quality in that the first photograph was taken with a Polaroid camera and scanned, and Davis had more hair in the first photograph.  Id. at 9:23-10:8.

[12]        It appears that Novikov and Vogel viewed the second line-up together.

[13]        When officers found the calculators, they did not yet know that Volante was missing them.  Id. at 12:5-7.

an in-person line-up, instead of with photographs.  Id. at 18:2-9.  Othick replied that he did not

know, and that Lawrence police did not have facilities to do that.  Id. at 18:10-13.  Othick testified

that he did have capability to tape record and/or videotape photo line-up identifications, but he did

not do so.  Id. at 19:14-8.  Defense counsel pointed out that Davis was the only person featured in

both photo line-ups, and that Othick could have used more than six photographs for the line-ups.

Id. at 20:15-21:25.

    The defense called Davis, who testified to the following facts: Davis is 30 years old, five

feet, six inches tall and weighs 180 pounds.  Id. at 46:11-23.  Other than court hearings, Davis has

never seen Lozina, Novikov or Vogel.  Id. at 35:8-16.  Davis had possession of Volante's calculators

because his former roommate, Jerry Hunter, gave them to him.  One or two years earlier, Davis

roomed with Hunter for a few months.  Id. at 38:18.  Davis has not seen or talked to Hunter since

that time, id. at 38:14-16, but some time before officers executed the search warrant on April 28,

Hunter went to Davis' apartment.  Id. at 38:17-39:1.  Hunter had some computers and a tote sack

which contained calculators and other stuff.  Id. at 39:23-40:9.  Hunter asked Davis where he could

get rid of some computers.  Id. at 39:8-10.  Davis did not know.  Id. at 39:11-12.  Davis liked the

calculators and asked Hunter for them.  Id. at 40:20-24.  Hunter wanted Davis to sell the calculators,

but Davis refused.  Hunter then gave the calculators to Davis.  Id. at 40:20-24, 41:15-23.  On cross

examination, Davis identified a photograph of Hunter (Defendant's Exhibit A) and stated that it

accurately depicted Hunter.  Id. at 1-8.

    The defense called Steve Verbanic, Lawrence police officer, who testified to the following

facts: On the morning of April 9, 1998, Verbanic met with Novikov and Lozina.  Id. at 48:6-15.

Novikov translated for Lozina and an older man was also present and helped translate.  Id. at 48:14-

49:9.  Verbanic did not take notes during the interview, but he completed a report.  Id.  The report indicates that Novikov described the intruder as a black man in his early twenties, about five feet, four inches tall, weighing 145 pounds.  Id. at 49:16-24.  Verbanic testified that Novikov did not describe the intruder in those exact words, but that was the best translation which Verbanic could make of what Novikov told him.  Id. at 4-13.  On cross examination, Verbanic admitted that he experienced communication problems during the interview.  Id. at 55:12-14.

The defense called Scott Connell, Lawrence police officer, who testified that he knew Jerry Hunter, Jr., a 31 year-old African American man.  Id. at 56:1-10.  Defense counsel attempted to question Connell about an incident on June 1, 1998, when he arrested Hunter for aggravated burglary within four blocks from the Vogel and Novikov/Lozina apartments.  See id. at 57:11-65:9.  The State objected based on relevance.  Id. at 57:14-5, 60:2-4.  The defense responded that such evidence would show that Hunter – who was the same age as and looked similar to Davis – continued committing aggravated burglaries in the same area after Davis' arrest.  Id. at 60:9-13, 61:5-8, 63:9-25.  The court sustained the objection, finding that evidence regarding a burglary on June 1, 1998 was too remote in time to the charges against Davis, which involved burglaries committed on April 9 and 12, 1998.  Id. at 57:16-17, 65:1-8.

Defendant called Mack Pryor, Lawrence police officer, who testified to the following facts:  In another criminal case, the State alleged that on April 14, 1998, Hunter burglarized an apartment at 1128 Ohio, about four blocks from the Novikov/Lozina apartment, and stole computer equipment and a duffle bag.  Id. at 70:7-72:7.  At the time of the incident, Hunter lived at 1339 Tennessee, within a block of the Novikov/Lozina apartment.  Id. at 71:16-72:5.  Hunter is approximately the same size as Davis, maybe smaller.  Id. at 72:13-25.  On cross examination, Pryor stated that it was rare for a series of burglaries to occur in the same neighborhood in Lawrence.  Id. at 74:10-18.

The defense attempted to question Kelly Shoemaker, court services officer, about Hunter's criminal history. The court excluded the testimony as irrelevant. Id. at 75:11-76:15.

The defense called Michael Barrow, Lawrence police officer, who testified that on April 15, 1998, police recovered stolen property from Hunter's residence, including miscellaneous electronic items, clothing and duffle-type bags. Id. at 78:13-79:12.

In closing argument, defense counsel focused on problems with eyewitness identification and the fact that Hunter burglarized homes in the same vicinity during the same time period. Id. at 110:1-18. Counsel told the jury to look at Hunter's photograph and determine whether he resembled Davis. Id. at 111:5-8. Counsel pointed out that Davis has a mole on his face and that in describing the intruder, none of the eyewitnesses mentioned this feature. Id. at 114:11-19. Counsel argued that none of the eyewitnesses identified Davis in the first photo line-up, and that showing only six photographs was unfair. Id. at 115:5-23. Counsel pointed out that Novikov – who had the most time to view the intruder – could not identify Davis as the intruder. Id. at 122:2-11. Counsel also suggested that police should have dusted the calculators for finger prints to determine whether Hunter had handled them. Id. at 118:10-20.

### Evidence At K.S.A. § 60-1507 Hearing

On January 18 and 19, 2002, the state district court held an evidentiary hearing on Davis' petition for habeas relief under K.S.A. § 60-1507.

The State called Frydman, trial defense counsel, who testified to the following facts: Davis originally told Frydman that he and his brother had obtained from an abandoned apartment the calculators and other property which police found in his apartment. See Transcript of 60-1507 Hearing, Record-Vol. No. XXI at 16:8-15. Frydman asked Davis' brother about the story, but the brother denied it. Id. at 19:22-20:10. Frydman relayed this information to Davis. Davis then said

that his previous recollection was incorrect, and that Hunter had left the property at his apartment. Id. at 21:11-16. Frydman testified that at trial, he presented the defense theory that eyewitness identifications were incorrect and based on improper police technique, and that Hunter was the real perpetrator. Id. at 35:22-36:13. Frydman explained that he brought out the fact that police did not tape the photo line-up procedures to determine whether police made suggestive comments to the witnesses. Id. at 36:17-37:11. Frydman also pointed out that Vogel's testimony had strengthened over time, though she could not positively identify Davis in either of the photo line-ups, which was contrary to the normal assumption that one's memory would be stronger closer to the time of viewing rather than later. Id. at 37:12-38:15.

Frydman testified that he did not file a motion to suppress evidence regarding the photo line-ups because he thought the evidence would likely help the defense rather than hurt it. Id. at 48:21-23. Frydman believed that Vogel's failure to positively identify Davis in either photo line-up undermined the credibility of her in-court identification. Id. at 48:25-49:11, 50:13-25. Frydman also believed that a motion to suppress would have been futile and that the court would have allowed the evidence anyway. Id. at 49:12-50:7.

To investigate Davis' defense that Hunter committed the crimes, Frydman read newspaper reports of burglaries which occurred during the same time and pulled a court file in which Hunter was listed as defendant for a burglary committed on April 14, 1998. Id. at 51:16-25. Frydman also attended a court hearing so that he could see what Hunter looked like. Id. at 52:2-9. Frydman determined that Hunter did not look like Davis in person, but that a photograph of Hunter (Defendant's Exhibit A) looked more like Davis. Id. at 52:10-16.

On cross examination, Frydman stated that he obtained the court file – but not police reports – for the burglary which Hunter allegedly committed on April 14, 1998. Id. at 62:20-63:11. The

police reports revealed that police suspected that Hunter had committed at least four burglaries which occurred around the same date in the same neighborhood as the crimes in question.  See Petitioner's Exhibits 10 and 12, Record-Vol. Nos. XV and XVII.  Frydman stated that such information would have helped support defendant's claim that Hunter – not Davis – had committed the crimes.  Id. at 63:15-24.

Petitioner offered into evidence several police reports which allegedly would have helped his defense.  The reports included:

- Investigation reports regarding an aggravated burglary at 1316 Tennessee, Apartment 1, on October 15, 1995, in which an intruder entered an unlocked door at 3:00 a.m., stole money from a wallet and when confronted by an eyewitness asked, "Is Jeff here?"  In a photo line-up, the eyewitness identified Hunter as the man who most closely resembled the intruder.[14]  See Petitioner's Exhibit 4, Record-Vol. No. XII.

- Investigation reports regarding an aggravated burglary at 1332 Vermont, Apartment 2, on October 16, 1995, in which an intruder entered an unlocked door, stole 90 cents from the table and when confronted by an eyewitness stated, "I have the wrong number."  In a photo line-up, the eyewitness identified Hunter as the intruder.[15]  See Petitioner's Exhibit 3, Record-Vol. No. IX.

- Investigation reports regarding an aggravated burglary at 309 East 11th Street on

---

[14]     Police showed the witness two photo line-ups.  The first photo array included a picture of Hunter, but not Davis.  The witness identified Hunter as the person who most closely resembled the intruder.  The second array included a picture of Davis, but not Hunter.  The witness did not identify any of the subjects in the second array.

[15]     The photo array did not include Davis.

November 2, 1989.  A black man entered while a resident was home and stole items including a camera, jacket, hat, checkbook and back pack.  When confronted by the resident, the intruder said, "I thought this was Tom's house, I'm looking for Tom."  On November 6, police discovered Hunter wearing the stolen jacket and hat.  Police then discovered more of the missing items in Hunter's home.  Hunter admitted that he might have gone into the house and that the eyewitness might have seen him, but that Steve Miller had stolen the items.  In a photo line-up, the eyewitness identified Hunter as the intruder.[16]  Hunter pleaded guilty to the crime.[17]  <u>See</u> Petitioner's Exhibit 5, Record-Vol. No. IX.

- Investigation reports which indicate that police suspected that Hunter had stolen a check from the mail and cashed it.  <u>See</u> Petitioner's Exhibit 8, Record-Vol. No. XIV.

- Investigation reports which reveal that around 10:20 p.m. on June 1, 1998, police arrested Hunter for entering a house through a window screen.  A resident of the home called police when she heard someone inside.  Police saw Hunter running from the house when they arrived.  Hunter told police that he thought he knew the people who lived there.  <u>See</u> Petitioner's Exhibit 14, Record-Vol. No. XIV.

<u>See</u> Transcript of 60-1507 Hearing, Record-Vol. No. XXI at 73-83.[18]  Frydman testified that such information would have been extremely helpful to the defense.  <u>See</u> <u>id.</u> at 82:1-83:8.

Petitioner also offered an affidavit which an assistant district attorney filed with regard to

---

[16]     The record does not reflect whether the photo array included Davis.

[17]     The record does not reveal whether Hunter was convicted or pleaded guilty on any other crime.

[18]     Petitioner also offered Exhibit 13, <u>see</u> <u>id.</u> at 81:16-19, but the Court is unable to locate this exhibit in the record.

a burglary on October 16, 1995.  See Petitioner's Exhibit 2, Record-Vol. No. X. The affidavit states

that the eyewitness described the intruder as a black male, 18-20 years old, between five feet, five

inches and five feet, seven inches tall, about 136 pounds, with a "box" hair cut.  See id. ¶ 2.  The

affidavit further states that officers determined that this description matched two known black males,

Hunter and Davis, who lived at 1319 Vermont, Apartment 5.  See id. ¶ 3.  Petitioner contends that

this evidence shows that Hunter and Davis look alike.

On re-direct examination, Frydman testified that he did not seek police records for burglaries

committed by Hunter because he did not expect that the reports would state that Hunter had spoken

to the victims, or that Hunter had used the name Jeff.  See Transcript of 60-1507 Hearing, Record-

Vol. No. XXI at 93:5-22.  Frydman assumed that the reports would reiterate information which he

already had, i.e. that a black man who looked similar to Davis had committed burglaries in the same

general vicinity in the same general time frame.  Id. at 94:3-8.

Petitioner called Solomon M. Fulero, Ph.D, J.D., who testified as an expert on eyewitness

identification to the following facts:[19] Juries are highly persuaded by in-court eyewitness

identification, but the accuracy of such identification is less than what lay people believe.  See

Testimony of Solomon M. Fulero, Ph.D., J.D., Record-Vol. No. XXII at 35:21-36:14.  A person's

memory can change based on information which he or she receives after an event occurs.  See id.

at 37:9-38:19.  The longer a witness views a person's face, i.e. the longer the so-called "exposure"

time, the more accurate the identification.  Id. at 41:22-42:22.  A witness estimation of exposure

time is typically inaccurate, however, especially when the witness is under stress.  Id. at 43:8-14.

---

[19]     Fulero served on the Technical Working Group for Eyewitness Evidence, which
helped the Department of Justice prepare a guide for law enforcement regarding eyewitness
evidence.  The guide was published in October of 1999.  See Petitioner's Exhibit 19, Record-Vol.
No. XX.

In addition, witnesses who are under stress are less accurate in eyewitness identification.  Id. at 45:18-46:1.  Cross-racial identifications are also less accurate than same race identification.  Id. at 46:19-25.

Accuracy of memory decreases with time and people generally forget most of what they are going to forget within the first eight hours after an event.  Id. at 51:1-6.  Eyewitness guidelines for law enforcement therefore place great emphasis on early, accurate and complete recording of eyewitness evidence.  Id. at 51:7-11.  Information which a person receives after an event, or so-called "post-event" information, can become incorporated into his or her memory and experienced as though it happened at the earlier time.  Id. at 52:5-9.  Photo spreads and line-up procedures are good examples of post-event information.  Id. at 52:18-21.

Research reveals that the following factors affect the accuracy of eyewitness identification based on photo spreads:

- Instructions given to the witness.  It is very important that the administrator instruct the witness that the line-up may or may not contain a picture of the person that he or she saw.  Id. at 58:23-50:4.  Otherwise, if the witness thinks that the line-up definitely contains the suspect, he or she will pick the person who looks most like the person he or she remembers.  Id. at 60:4-9.

- Whether the photo spread is administered in a so-called "double-blind" fashion.  It is very important that the person administering the spread not know who the suspect is so that he or she cannot unconsciously communicate the expected result to the witness.  Id. at 55:3-57:8.

- Whether the photo spread is administered simultaneously or sequentially.  If the administrator gives the witness photos at the same time, the task becomes a process

of elimination and the witness chooses the person who looks most like the person he or she remembers.  Id. at 60:10-25.  A better way to proceed is to show the witness one picture at a time.  This so-called "sequential procedure" substantially reduces false identification rates without affecting correct identification rates.  Id. at 61:1-13.

• Construction of the spread.  All of the photos should bear roughly equal resemblance to the description of the suspect.  Id. at 62:5-25.

• Use of multiple photo spreads.  If a witness is shown two photo spreads and the only common element is that both contain a picture of the suspect, the witness may recognize the suspect based on his or her memory from the first photo spread and not from the actual event.  Id. at 57:15-58:4.

With regard to photo line-ups, witnesses should not participate in the process simultaneously. In other words, witnesses should be tested separately and should not know what the other witness said. Id. at 84:12-16.  In addition, law enforcement should not give witnesses "post-identification feedback" whether their choice was correct.  In addition, law enforcement should not tell eyewitnesses anything about additional evidence which may be present.  Id. at 84:16-21.  Such information can distort eyewitness accounts and artificially inflate the witness' level of confidence. Id. at 84:16-21.  If Vogel learned that police found stolen property in Davis' apartment, such information would affect the reliability of her in-court identification.  Id. at 85:3-14.

With regard to in-court identification, the jury should consider whether the identification is based on the witness' memory of the actual event, or the witness' memory of post-event information. Id. at 64:6-65:5.  In addition, the jury should know that research reveals that an eyewitness level of confidence bears no relationship to accuracy.  Id. at 66:11-12.  In other words, a person who is 100 per cent confident is just as likely to be wrong as a person who is somewhat uncertain.  Id. at

66:13-16.

## **Legal Standards**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-32, 110 Stat. 1214, (codified in relevant part at 28 U.S.C. § 2254), governs the Court's review in this case. Under Section 2254, as amended by the AEDPA, the Court may not issue a writ of habeas corpus with respect to any claim which the state court adjudicated on the merits unless that adjudication resulted in a decision:

> (1) . . . that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) . . . that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Under the "contrary to" clause, the Court may issue a writ of habeas corpus only if (1) the state court arrived at a conclusion opposite to that reached by the United States Supreme Court on a question of law, or (2) the state court decided the case differently than the Supreme Court on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, the Court may grant habeas relief if the state court "correctly identifie[d] the governing legal rule but applie[d] it unreasonably to the facts of a prisoner's case." Id. at 407-08. The Court may not issue a writ simply because it concludes, in its independent judgment, that the state court applied clearly established federal law erroneously or incorrectly; rather the application must be objectively unreasonable. Id. at 409-11.

## **Analysis**

Davis seeks habeas relief on the grounds that (1) the prosecutor failed to disclose exculpatory evidence; (2) trial counsel was ineffective; and (3) cumulative error. Respondents deny petitioner's

claims.

## I.      Failure To Disclose Exculpatory Evidence

Petitioner claims that the prosecution failed to disclose material exculpatory evidence. Specifically, petitioner asserts that the prosecution should have disclosed that (1) police reports implicated Hunter in four burglaries in the same neighborhood around the same date as the Vogel and Novikov/Lozina burglaries; (2) police reports indicate that Hunter used the same modis operandi – "Is Jeff here?" – in previous burglaries in 1995 and 1989; and (3) in October of 1995, an assistant district attorney signed an affidavit which stated that an eyewitness description – a black male, 18- 20 years old, between five feet, five inches and five feet, seven inches tall, about 136 pounds, with a "box" hair cut – matched two known black males, Hunter and Davis.  Petitioner claims that this information would have strengthened his defense at trial , i.e. that Hunter committed the crimes in question.

In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court held that regardless of good faith, a prosecutor violates due process if he or she suppresses favorable evidence which is material either to guilt or punishment of an accused.  See id. at 87.  Favorable evidence is material if a reasonable probability exists that had the prosecution disclosed the evidence, the result of the proceeding would have been different.  Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (citing United States v. Bagley, 473 U.S. 667, 682 (1985)).  The question is not whether disclosure of the suppressed evidence would have more likely than not resulted in a different verdict, but whether in its absence, defendant received a fair trial, i.e. a trial which resulted in a verdict worthy of confidence.  Kyles, 514 U.S. at 434.  A "reasonable probability" of a different result exists when the suppression of evidence "undermines confidence in the outcome of the trial."  Id. (quoting Bagley, 473 U.S. at 678).  In determining whether favorable evidence is material, the Court considers the

undisclosed evidence collectively, as a whole.  <u>Kyles</u>, 514 U.S. at 436.

Petitioner asserts that the Kansas Court of Appeals applied a legal standard which is contrary to clearly established Supreme Court law.  In affirming the state district court decision, the Kansas Court of Appeals articulated the following standard:

> when the prosecutor has not deliberately and in bad faith withheld evidence from the defense and has not refused to honor a request for such evidence, a new trial should be granted only if: (1) the prosecutor withheld the evidence; (2) the withheld evidence was clearly exculpatory; and (3) the withheld exculpatory evidence was so material that to withhold this information from the jury was clearly prejudicial to the defendant.  <u>State v. McCarty</u>, 271 Kan. 510, 514, 23 P.3d 829 (2001).

<u>Memorandum</u> filed November 24, 2004 in No. 91,517 at 22.  The Court of Appeals offered no analysis under this standard.  It simply stated, "We agree with the trial court's reasoning and determine that the alleged exculpatory information that was withheld from the defense did not amount to prejudicial error."  <u>Id.</u>

The state district court provided the following analysis for its decision:

> The petitioner has failed to produce any evidence that the claimed exculpatory and material evidence was intentionally withheld or that Mr. Frydman made any specific requests for this type of information.  Although the prosecutor had a duty to disclose [exculpatory material] evidence . . . the undisclosed information was not readily apparent to be exculpatory or material in nature . . . .  "As the specificity of the defendant's request increases, a lesser showing of materiality will suffice to establish a violation.  Conversely, as the defendant's request becomes more general or even nonexistent, a greater showing of materiality is required to establish a Brady violation."  <u>Smith v. Sec'y of N. Mex. Dept. of Corrections</u>, 50 F.3d 801, 827 (10th Cir. 1995).  The undisclosed information does not add enough that it could reasonably be taken to undermine confidence in the verdict.  Evidence that some other person was burglarizing the neighborhood during the same time period was introduced to the jury, and that could have supported a different verdict had the jury found it persuasive.

<u>Memorandum Of Decision</u> filed September 24, 2003 in No. 00-C-394 at 5-6.

Petitioner claims that to establish a <u>Brady</u> violation, the Supreme Court does not require that withheld evidence be "clearly exculpatory" or "so material" that it is "clearly prejudicial."

- 20-

Memorandum In Support Of Petition For Writ Of Habeas Corpus ("Petitioner's Memorandum") (Doc. #2) filed April 28, 2006 at 11. It does appear that the standard which the Kansas Court of Appeals articulated does not track the language used by the United States Supreme Court. The state court, however, did not reach a conclusion which is contrary to Supreme Court law.[20] The Court of Appeals stated that it agreed with the reasoning of the state district court, which found that the undisclosed information did not "add enough that it could reasonably be taken to undermine confidence in the verdict." Memorandum filed November 24, 2004 in No. 91,517 at 22 (quoting Memorandum Of Decision filed September 24, 2003 in No. 00-C-394 at 5-6). This is precisely the

---

[20]        The Court notes that the Kansas courts articulated standards which appear to be inconsistent with current Supreme Court law. For instance, the state district court cited a sliding scale under which defendant must make a greater showing of materiality if he did not specifically request the undisclosed information. See Memorandum Of Decision filed September 24, 2003 in No. 00-C-394 at 5-6. The Supreme Court, however, applies the same standard regardless whether defendant requested the information. See Kyles, 514 U.S. at 434-35 (citing Bagley, 473 U.S. at 682, 685). In addition, the Supreme Court does not require that withheld evidence be clearly exculpatory. See Gonzales v. McKune, 247 F.3d 1066, 1075 (10th Cir. 2001), vacated in part on other grounds, 279 F.3d 922 (10th Cir. 2002). Petitioner asserts that Gonzales supports his position that the state court applied a standard which is contrary to Supreme Court precedent. See Petitioner's Memorandum (Doc. #2) at 11-12. Gonzales is distinguishable. In Gonzales, the prosecution did not disclose that a semen sample contained no sperm. Petitioner claimed that this information would have helped his defense because he produced sperm. A forensic chemist, however, testified that the absence of sperm would neither prove nor disprove that the donor produced sperm. See Gonzales, 247 F.3d at 1077. The Kansas Court of Appeals denied habeas relief on the ground that the withheld evidence was not clearly exculpatory. Id. at 1075. The Tenth Circuit found this ruling erroneous, because to qualify as exculpatory evidence under Brady, the withheld information need only be "favorable" to the defense; it need not conclusively exonerate defendant. Id. Because the state court did not decide whether the undisclosed information was material, the Tenth Circuit addressed the question de novo. Id. at 1076. Here, the state court specifically found that the undisclosed information was not material, i.e. that it did not undermine confidence in the verdict. See Memorandum filed November 24, 2004 in No. 91,517 at 22 (quoting Memorandum Of Decision filed September 24, 2003 in No. 00-C-394 at 5-6). Thus in this case, even if the Kansas court erroneously required that the undisclosed information be "clearly exculpatory," the error did not affect the outcome of the case because the state court also determined that the undisclosed information was immaterial, i.e. that withholding the evidence did not reasonably undermine confidence in the verdict. See Kyles, 514 U.S. at 434.

determination which Supreme Court law requires. <u>See</u> <u>Kyles</u>, 514 U.S. at 434.[21] Because the Kansas court identified the correct governing legal rule, the Court may grant habeas relief only if the state court applied the rule unreasonably to the facts of this case. <u>See</u> <u>Williams</u>, 529 U.S. at 407-08.

The state district court determined that because petitioner introduced evidence that police charged Hunter with a burglary in the same neighborhood during the same time frame, the withheld information did not provide sufficient additional benefit to the defense so as to reasonably undermine confidence in the verdict. <u>See</u> <u>Memorandum</u> filed November 24, 2004 in No. 91,517 at 22 (quoting <u>Memorandum Of Decision</u> filed September 24, 2003 in No. 00-C-394 at 5-6). This conclusion is reasonable. Davis testified that he received Volante's calculators from Hunter, who was trying to get rid of computers and other equipment. Davis also presented a photograph of Hunter to show that eyewitnesses could have mistakenly identified Davis instead of Hunter. In addition, the jury heard evidence that (1) in another criminal case, the prosecution charged that on April 14, 1998, Hunter stole computer equipment and a duffle bag from an apartment located within four blocks of the Novikov/Lozina apartment; (2) Hunter lived within a block of the Novikov/Lozina apartment; (3) on April 15, 1998, police recovered stolen property from Hunter's residence, including miscellaneous electronic items, clothing and duffle-type bags; and (4) Hunter was the same size as Davis, maybe smaller. The fact that police suspected that Hunter had burglarized three additional apartments in the area, or that a district attorney affidavit stated that both Hunter and Davis matched an eyewitness description would not have added significantly to evidence which was

---

[21]     Indeed, it appears that in other cases, Kansas courts have articulated the standard set forth by the Kansas Court of Appeals, <u>i.e.</u> that evidence must be clearly exculpatory and material so that its suppression was clearly prejudicial to defendant, and applied the Supreme Court standard, <u>i.e.</u> that evidence is material if a reasonable probability of a different result exists. <u>See</u>, <u>e.g.</u>, State v. Aikins, 261 Kan. 346, 381-386, 932 P.2d 408, 434- 437 (Kan. 1997).

already before the jury.  Investigation reports which indicate that Hunter used the same modis operandi ("Is Jeff here?") may have helped the defense, but petitioner has not shown that the reports – which involved burglaries in 1989 and 1995 (three to nine years earlier) – would have been admissible.  Moreover, in light of the fact that Davis had lived with Hunter, the jury could reasonably infer that Davis learned his modis operandi from Hunter.  On this record, the state court reasonably concluded that the prosecution's failure to disclose exculpatory information did not undermine confidence in the outcome of the trial.  Davis is not entitled to habeas relief on this ground.

## II.        Ineffective Assistance Of Counsel

Petitioner contends that trial counsel was ineffective in (1) failing to object to eyewitness identification evidence; and (2) failing to investigate exculpatory evidence regarding Hunter.  To show ineffective assistance of counsel, Davis must make two showings.  First, he must show that counsel's performance was deficient, i.e. that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment."  Strickland v. Washington, 466 U.S. 668, 687 (1984).[22]  Second, Davis must show that the deficient performance prejudiced his defense, i.e. that counsel's errors were so serious as to deprive him of a fair trial.  Strickland v. Washington, 466 U.S. at 687.  To establish the first element – deficient performance – Davis  must show that counsel's representation fell below an objective standard of reasonableness.  Id. at 688.  To establish the second element – prejudice – Davis must show a reasonable probability that but for the errors of counsel, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id. at 694.

---

[22]        Strickland constitutes clearly established federal law under the AEDPA even though its test, by necessity, requires a case-by-case examination of evidence.  See Williams, 529 U.S. at 390-91; Upchurch v. Bruce, 333 F.3d 1158, 1162-1164 (10th Cir. 2003).

### A.     Eyewitness Identification Evidence

Davis asserts that trial counsel should have objected to Vogel's out-of-court and in-court identifications.  Specifically, Davis contends that the photo line-ups were impermissibly suggestive because police repeated only his picture in the second line-up, which caused Vogel to recognize him from the first line-up.  Davis further contends that Vogel recognized him in court because she twice saw his picture in the photo line-ups.  See Petitioner's Brief (Doc. #2) at 14-15.

When pretrial identification occurs under impermissibly suggestive circumstances and in-court identification is unreliable, the identification should be excluded.  See Grubbs v. Hannigan, 982 F.2d 1483, 1489-90 (10th Cir. 1993); United States v. Aigbevbolle, 772 F.2d 652, 653 (10th Cir. 1985).  In Neil v. Biggers, 409 U.S. 188 (1972), the Supreme Court set forth five factors to consider in determining whether an eyewitness identification is reliable: (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witnesses' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) and the length of time between the crime and the confrontation.  Id. at 199-200.  A court must weigh these factors against the corruptive effect of any suggestive pre-trial identification procedures to determine whether identification testimony is reliable.  See Manson v. Brathwaite, 432 U.S. 98, 114 (1977).  In so doing, the court must determine whether under all the circumstances, a substantial likelihood of irreparable misidentification exists.  Id. at 116.

The Kansas Court of Appeals found that counsel's conduct did not fall below an objectively reasonable standard.  Specifically, the state court found that counsel reasonably decided to attack the credibility of Vogel's identifications at trial, and that counsel likely would not have succeeded in suppressing evidence regarding Vogel's identifications.  See Memorandum filed November 24, 2004 in No. 91,517 at 13-21.  Petitioner agrees that the Kansas Court of Appeals applied the correct

legal standards.  See Petitioner's Memorandum (Doc. #2) at 14.  Therefore, this Court must decide whether the state court applied the law unreasonably to the facts of this case.  See Williams, 529 U.S. at 407-08.  At trial, counsel emphasized that Vogel did not identify Davis in the first line-up, that Vogel could not positively identify Davis in the second line-up and that police unfairly included a picture of Davis in both photo line-ups.  This evidence arguably provided defendant's strongest attack against Vogel's in-court identification of Davis.  Moreover, the state court reasonably concluded that the photo line-up procedures were not impermissibly suggestive because although both line-ups contained pictures of Davis, the photographs were different and did not look like the same person.  Indeed, several witnesses testified (and the Court's review of the photos confirms) that the second picture of Davis does not look like the first photograph of him.  On this record, the state court reasonably concluded that counsel's trial strategy was sound and that counsel likely would not have succeeded suppressing Vogel's identifications of Davis.  See Memorandum filed November 24, 2004 in No. 91,517 at 15-21.  Davis is not entitled to habeas relief on this ground.

### B.    Exculpatory Evidence Regarding Hunter

Davis contends that trial counsel was ineffective in not asking the State for information regarding Hunter.  See Petitioner's Memorandum (Doc. #2) at 16.  Davis did not raise this issue in the state court proceeding.  See Brief of Appellant filed April 14, 2004 in No. 03-91517-A.  Because Davis has not exhausted state court remedies on this claim, see Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991), he cannot obtain federal habeas corpus review unless he can demonstrate cause for the default and actual prejudice, or that failure to consider the claims will result in a fundamental miscarriage of justice.  Id. at 750.  Davis has not shown cause for default or actual innocence.  See Phillips v. Ferguson, 182 F.3d 769, 774 (10th Cir. 1999) (miscarriage of justice exception extremely narrow and arises only where constitutional violation has probably resulted in conviction of one who

is actually innocent).  The Court therefore denies habeas relief on this ground.

**III.     Cumulative Error**

Davis seeks relief based on cumulative error.  He did not raise this issue in state court proceedings and therefore has procedurally defaulted on such claim.  See Scott v. McKune, No. 04-3360-KHV, 2005 WL 2589197, at *15 (D. Kan. Oct. 13, 2005) (citing Sillick v. Ault, 358 F. Supp.2d 738, 778 n.15 (N.D. Iowa 2005); Nguyen v. Runnels, No. CO3-0689CRB, 2003 WL 22939239, at *13 (N.D. Cal. Dec. 5, 2003); Arroyo v. Greiner, No. 00 Civ. 2301, 2002 WL 1685007, at *2 (S.D.N.Y. June 23, 2002)).  Davis has not shown cause for the default or actual innocence and therefore is not entitled to federal habeas relief on this ground.  See Coleman, 501 U.S. at 750; Phillips, 182 F.3d at 774.

**IT IS THEREFORE ORDERED** that petitioner's Petition Pursuant To 28 U.S.C. § 2254 (Doc. #1) filed April 28, 2006 be and hereby is **OVERRULED**.

Dated this 24th day of May, 2007 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge